UNITED STATES DISTRICT COURT
WESTERN DISTRICT of TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **TED HOPKINS ROBERTS,** | § | |
| **TDCJ # 1637350,** | § | |
| | § | |
| **Petitioner** | § | |
| | § | **Civil Action** |
| **v.** | § | **No. SA-11-CA-208-XR** |
| | § | |
| **JARVIS ANDERSON, Chief of the Bexar** | § | **Consolidated With** |
| **County Community Supervision and** | § | **No. SA-11-CA-276-XR** |
| **Corrections Department, and** | § | |
| **SUPERVISION OFFICER** | § | |
| **NANCY ZERMENO,** | § | |
| | § | |
| **Respondent** | § | |

## M E M O R A N D U M   D E C I S I O N

Before the Court are Petitioner Ted Hopkins Roberts's 28 U.S.C. § 2254 Habeas Corpus Petitions (No. 11-CA-208, Docket Entry # 6, No. 11-CA-276, Entry # 1) and Respondent's Answer seeking dismissal of the Petitions (Entry # 20), which this Court construes as a motion to dismiss.

## I.

Roberts was convicted by a Bexar County jury of three counts of theft and was sentenced to a suspended sentence of five years in *State v. Roberts*, No. 2006-CR-6404B (Tex. 226th Jud. Dist. Ct., *jmt. entered* June 12, 2007). His conviction was affirmed, and the Texas Court of Criminal Appeals refused his petition for discretionary review. *Roberts v. State*, 278 S. W. 3d 778 (Tex. Ct. App. 2008, *pet. denied*). His State habeas corpus application was denied. *Ex parte Roberts*, No. 73,992-1.

The Texas Fourth Court of Appeals described the evidence at trial as follows:

> Christi Treviño began working as a receptionist at Roberts's law firm in July of 1999. In 2001, Roberts informed Treviño that his wife, Mary, had engaged in an affair. Treviño stated that after Roberts learned of his wife's affairs, "he [planned] to meet with all the people that she had an affair with and present them with documents asking for money." . . . Treviño testified that Roberts did not bring in extra attorneys to help with the law firm during this period of time, and

neither Sherry Gonzales nor Barbara Hutzler worked for Roberts while Treviño worked at the law firm. . . .

In October of 2001, Roberts contacted Allan Harvison, a private investigator with Security Management International ("SMI"), requesting computer forensic work. Harvison contacted David Getrost, who performed the computer forensic work for SMI. Roberts informed Harvison, his partner Ron Oling, and Getrost that he believed his wife was having an affair and wanted to obtain information from her computer to confirm his belief. When Harvison subsequently met with Roberts to provide him with the information recovered from the computer, Roberts told Harvison, "These individuals are going to contribute to my favorite charity: Me." Harvison heard that Getrost witnessed Roberts break down and cry upon receiving more of the information that was retrieved.

. . . Getrost removed information from the hard drive [of a computer from the Robert's home] that [was] delivered to Roberts. Getrost stated that when he delivered some of the information, Roberts became upset and cried. During another meeting, Getrost testified that Roberts made the following comment:

> that he was going to use his wife's accounts and contact some of these people that I had found this information on and set up meetings posing as her at hotels and when they showed up, he was going to be sitting there on the bed smoking a big fat cigar, and when they walked in, he said he was going to ask them if they brought their checkbook because they were going to write a healthy check to his favorite charity, his kids, and then he laughed.

. . . .

Paul James Fitzgerald, an accountant, had an affair with Mary that began in early August of 2001 and ended in September of 2001. . . . Roberts subsequently contacted Fitzgerald to set up a meeting to discuss Fitzgerald's relationship with Mary.

Roberts . . . told [Fitzgerald] how distraught and emotionally upset he was in finding out about the affair and that he had to hire other attorneys to assist him because he was unable to work. Fitzgerald apologized to Roberts and asked if they could just move forward, but Roberts told him that he needed to suffer for what he did by paying him some money. Roberts stated that his own penance would be to make a sizable donation to a children's foundation he was establishing.

Roberts either handed Fitzgerald a petition at the meeting or sent the petition to Fitzgerald the following day. The petition was drafted based on Rule 202 of the Texas Rules of Civil Procedure and was requesting the court's permission to investigate claims.[FN1]  The petition had a copy of various highlighted sections of the Texas Penal Code attached which made Fitzgerald think that he had unknowingly committed a crime.  This was significant to Fitzgerald because he could potentially lose his CPA license.  The petition also mentioned the possibility of deposing Fitzgerald's wife and obtaining access to the hard drives of all his business and personal computers which would be damaging because his computers contained client information.  Roberts demanded $25,000 from Fitzgerald, and Fitzgerald ultimately agreed to pay $15,000.  Fitzgerald gave Roberts three checks totaling $15,000 on November 21, 2001.  One check was to SMI to cover the cost of having Mary's computer analyzed, and two checks were to attorneys who allegedly assisted Roberts with his case load when he was too distressed to work.  At that time, Fitzgerald did not have an attorney. . . . Although Fitzgerald considered stopping payment on the checks, he could not risk the actions that were mentioned in the petition.  Roberts never mentioned to Fitzgerald that Mary was having affairs with at least four other men.

FN1. Rule 202.1 provides, "A person may petition the court for an order authorizing the taking of a deposition or oral examination or written questions . . . to investigate a potential claim or suit."  Tex. R. Civ. P. 202.1(b).

Geoffrey Ferguson, a lawyer, had an affair with Mary in August of 2001. Mary subsequently contacted Ferguson and told him Roberts knew something had happened.  Roberts later contacted Ferguson and told him they needed to meet. . . .  Roberts handed Ferguson an envelope with a Rule 202 petition which Ferguson stated he would review later.  Roberts referenced e-mails Mary exchanged with Ferguson while Roberts and Mary were on vacation in California. Roberts mentioned that he was getting counseling.  Roberts told Ferguson that he was upset and needed to be made whole referring to expenses relating to the vacation and counseling.  Roberts did not tell Ferguson that he had been in counseling for some time, not just since the affairs.  Ferguson was given the impression that the counseling was triggered by his relationship with Mary. Roberts insinuated that if the petition was filed, Ferguson's wife would learn of the affair. When Ferguson later reviewed the petition, it appeared that Roberts wanted to investigate whether Ferguson had committed various crimes resulting from the affair.  The petition also mentioned investigating Ferguson's law firm accounts. The petition listed Mary as a person with an adverse interest to Roberts, but Ferguson was not informed that Roberts and Mary had recently paid earnest money to purchase a new $625,000 home.

-3-

Several weeks later, Roberts met with Ferguson and requested $30,000. Roberts told Ferguson that his children were acting out in school and needed their own counseling in addition to his and Mary's counseling. Roberts did not mention that he was asking other men with whom Mary had affairs to pay for the same expenses he was requesting that Ferguson pay. Roberts said he had been unable to work and hired outside attorneys to help him. Roberts asked if Ferguson wanted to pay a foundation of which he was trustee the $30,000 or make the interest payment on his house for several months. Roberts told Ferguson he was the trustee of a children's foundation. Ferguson gave Roberts a check payable to "Ted H. Roberts, PC, Trustee." Ferguson testified that he would not have been willing to pay the money if he knew that Mary had two other affairs that were not disclosed to him or if those other men were being asked to pay the same expenses.

Steven Riebel, the chief financial officer of a company, had an affair with Mary in the summer of 2001. Riebel exchanged e-mails with Mary while she was in California on vacation with Roberts. Mary subsequently called Riebel and told him Roberts had discovered their relationship. Mary did not tell Riebel that she was having affairs with other men also. Riebel told her to make amends with her husband. Riebel told his wife, and they started counseling. Mary called Riebel and informed him that Roberts was investigating him and other men with whom Riebel started a company and that she was unsure how Roberts was going to use the information. Mary did not tell Riebel that Roberts also was investigating her other affairs. Mary called a third time and told Riebel that Roberts was investigating his current employer and that Roberts would be sending him some legal papers. A few days later, on November 12, 2001, Mary delivered the legal papers. The petition requested permission to investigate the company Riebel had started with other businessmen and his employer, including his employer's SEC filings. The petition listed numerous shareholders and officers of the companies as persons with adverse interests. Riebel believed that public disclosure of the contents of the allegations would be embarrassing and would cause people to lose confidence in him. Riebel feared that he would be terminated if the information was disclosed. Riebel met with an attorney who advised him that Roberts could proceed with the petition.

Riebel's attorney set up a meeting with Roberts in December of 2001. Prior to the meeting, Roberts sent a written list of expenses for which he was seeking reimbursement, including SMI's forensic computer investigation, his vacation to California, retainers for two attorneys who allegedly assisted in his practice, loss on sale of a vehicle in which Riebel and Mary had relations, and fees for psychologists. Riebel was unaware that Mary also had affairs with other men or that those men had paid for the same expenses for which Roberts was seeking reimbursement from Riebel. Other than paying for the expenses, Riebel's attorney stated that Riebel was unwilling to pay the additional amounts demanded. Roberts

stated that he and Riebel had a similar interest in children and that Roberts was intending to set up a charity for children in broken home situations. Roberts represented that the charity's money was to be used for daycare and those types of expenses. When Riebel told Roberts he wanted time to consider whether to contribute the additional amount demanded for the charity, Roberts informed him that he had five minutes to make a decision before Roberts decided what he intended to do with the legal papers. Roberts informed Riebel's attorney that he wanted reimbursement for $30,000 in expenses and a $70,000 contribution to the charity. Riebel agreed to make the payment on the condition that Roberts provided documentation that the charity was established with 501(c)(3) status by March of 2002. Riebel stated he would not have made the contribution if it was not to be used for its intended purpose, and he was never informed that the money was used by Roberts personally.

Reagan Sakai, a chief financial officer for a software company, had a sexual encounter with Mary in late summer of 2001 at a hotel in Austin. Mary subsequently contacted Sakai requesting to meet him for drinks at the Austin hotel. While Sakai was sitting at the hotel bar, . . . Roberts introduced himself as Mary's husband and handed Sakai some papers saying he needed to take them very seriously. Roberts left the bar after saying, "Research it. I've got you." After reading the papers, Sakai believed Roberts intended to file the papers in court and believed he could lose his job, his livelihood, and his family. Sakai believed the papers contained a hodge-podge of legal claims, including allegations that he had committed crimes. The petition also listed the other officers of Sakai's employer. . . . Roberts sent a letter demanding a $15,000 payment. Sakai stated that he was paying the money as "hush money" because he "was being shaken down." Sakai's attorney also advised him that he was being "shaken down" and would not be surprised if there were others involved. Sakai met with Roberts, and a final settlement for $10,000 was reached. Although Sakai made the check payable to a foundation, he did not care where the money went. He intended to pay $10,000 for the confidentiality agreement and to prevent the petition from being filed.

Chance Collins, a Texas Ranger, was instructed to contact an investigator at the district attorney's office to assist in investigating a criminal case against Roberts and Mary based on information published in a newspaper article. . . . Collins tracked the payments made to Roberts by Sakai, Riebel, Fitzgerald and Ferguson. Ferguson's check dated December 17, 2001, for $30,000 was deposited into Roberts's law firm account. Riebel's check dated December 18, 2001, for $30,000 was deposited into Roberts's law firm account on December 19, 2001. Also on December 19, 2001, a $93,000 withdrawal was made on that account to pay the down payment on the new home purchased by Roberts and Mary. Fitzgerald wrote three checks—one to SMI for $5,000, one to Sherry Gonzalez for $5,000, and one for $5,000 to Barbara Hutzler. Sakai's check dated December 21,

2001, for $10,000 was payable to the Genesis Foundation for Children and was deposited into a Compass Bank account established for the Roberts Foundation for Children.  Similarly, Riebel's check dated March 29, 2002, for $70,000 was payable to the Roberts Foundation for Children and was deposited into a Fidelity Investments account established for the Roberts Foundation for Children.  In June of 2002, $50,000 was withdrawn from this account and deposited into Roberts's law firm account.  Broadus Spivey testified that the use of the Rule 202 petition is common and lawful and is used as an investigative tool.

Spivey testified that rule 202 petitions prepared by Roberts demonstrate the state of the law in 2001 for the claims asserted, including the claim for intentional infliction of emotional distress and respondeat superior allegations.  Spivey testified that Roberts's decision not to the Rule 202 petitions did not mean he misrepresented his intent to file them before the settlements were reached.  Spivey testified that the petitions did not contain accusations, just requests to investigate potential claims.

278 S. W. 3d at 783-89.

## II.

Federal habeas corpus relief is available only where the petitioner demonstrates he is in custody in violation of his constitutional or other federal rights.  28 U.S.C. §§ 2241, 2254.  State law errors that do not implicate constitutional rights are not a basis for habeas corpus relief.  *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S. Ct. 475 (1991).  Rule 2(d) of the Rules Governing § 2254 Proceedings states the petition "shall set forth in summary form the facts supporting each of the grounds."  Conclusory and speculative allegations are not sufficient to entitle a petitioner to a hearing or relief in a § 2254 case.  *West v. Johnson*, 92 F. 3d 1385, 1398-99 (5th Cir. 1996); *Perillo v. Johnson*, 79 F. 3d 441, 444 (5th Cir. 1996).

Section 2254(b)(1)(A) requires the petitioner to exhaust available state court remedies before seeking federal habeas corpus relief.  To exhaust state remedies in Texas, a petitioner must present his claim to the Texas Court of Criminal Appeals by direct appeal or through a post-conviction writ application.  *Richardson v. Procunier*, 762 F. 2d 429, 431 (5th Cir. 1985).  Section 2254(d) requires this Court to defer to the state court's reasonable interpretations of federal law and reasonable

determinations of fact in light of the evidence presented in the state proceedings. Factual determinations of a state court are "presumed to be correct," and the petitioner has the burden of rebutting this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## - A -

Roberts first contends that the Texas theft statute is unconstitutionally vague and overbroad facially and as-applied in this case. To evaluate whether a statute is overbroad, the court must "determine whether the enactment [as written and as construed by the authoritative state court] reaches a *substantial amount* of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982) (emphasis added); *Ferguson v. Estelle*, 718 F.2d 730, 732-33 (5th Cir. 1983). If it does not, the overbreadth challenge must fail. *Id.* To satisfy due process, "a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983).

Roberts was charged with and convicted of theft from Riebel, Ferguson, Roberts, and Sakai by stealing money from the victims through coercion or deception in violation of Texas Penal Code § 31.03. Section 31.03(a) provides that a person commits theft if he "unlawfully appropriates property with intent to deprive the owner of the property." TEX. PENAL CODE § 31.03(a). "Appropriation of property is unlawful" if "it is without the owner's effective consent." *Id.* § 31.03(b)(1). "Effective consent" includes consent by a person legally authorized to act for the owner, and "[c]onsent is not effective if induced by deception or coercion." *Id.* § 31.01(3)(A). "Deception" includes "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true; [or] failing to correct a false impression of law or fact that is likely to affect the judgment of another in the

transaction, and that the actor does not now believe to be true." *Id.* § 31.01(1)(A)-(B). "Coercion" means "a threat, however communicated: . . . to accuse a person of an offense; to expose a person to hatred, contempt, or ridicule; [or] to harm the credit or business repute of any person." *Id.* § 1.07(a)(9)(C)-(E).

The Fourth Court of Appeals held that section 31.03 was not unconstitutionally overbroad or vague. It held that "the offense proscribed in the instant case is in many ways similar to bribery and extortion," which are not protected by the First Amendment, and thus "the type of speech prohibited by section 31.03 is not within the nature of speech protected by the First Amendment." *Roberts v. State*, 278 S.W.3d 778, 790 (Tex. App.–San Antonio 2008, pet. ref'd). The Fourth Court also held that "coercion" and "deception" were adequately defined such that the statute is not unconstitutionally vague. *Id.*

Roberts contends that § 31.03 is unconstitutionally vague and overbroad because "[t]he Texas theft statute can . . . be used to prosecute pre-trial settlement of legal claims if the potential defendant felt threatened, as do most adverse parties." However, the statute does not reach a substantial amount of constitutionally protected conduct. The mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge; there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds. *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984).

Roberts also complains that the theft statute is overbroad because it criminalizes "truthful" allegations and "lawful speech." The fact that the threat to expose an individual's sexual indiscretions might be lawful *in other contexts* is simply irrelevant. While exposing an individual's sexual indiscretions is not criminal, stealing money from an individual through the previously described

-8-

methods is a violation of the plain language of § 31.03.  The State court noted that the theft in this case is similar to extortion and blackmail, which are not protected speech under the First Amendment.  *See U.S. v. Irving*, 509 F. 2d 1325, 1331 n.5 (5th Cir. 1975).  The statute does not criminalize "truthful" allegations or "lawful speech," and thus is not overbroad.

Nor is the statute unconstitutional as applied to Roberts.  The record shows Roberts's claims to the victims, including threats of criminal prosecution, were meritless and followed by a variety of deceptions designed to unlawfully deprive them of their property.  Roberts's attempts to characterize his blackmail and shakedown of the victims as the "pre-trial settlement of legal claims" does not correlate with the record that indicates a vindictive interest to punish Mary's dalliances.

Nor is § 31.03 unconstitutionally vague.  Roberts deceived the victims once he created or failed to correct the false impression that: each of the victims was singularly involved with Mary (she had four extramarital affairs); the victims paid for expenses already shared by the similarly deceived; Roberts was distraught and unable to work, so he claimed a need to hire outside attorneys to assist in his practice except the evidence shows no outside attorneys were hired; he asserted a need for therapy due to the affairs, creating a false obligation because he was using therapy before these events; some of the funds he designated for the benefit of a children's charitable trust fund, but the funds actually landed in Roberts's personal business account.  Roberts coerced the victims by threatening them with baseless legal actions including criminal proceedings and threatening to involve the victims' families, employers, or business associates.  The record shows that the extorted funds were only released to Roberts due to his deception and coercion, and thus were transferred without effective consent.  The evidence shows Roberts stole funds from the victims through prohibited means in violation of the plain language of Texas Penal Code § 31.03. Section 31.03 is not unconstitutionally vague or overbroad either facially or as-applied in this case.

-9-

**- B -**

Roberts next argues that his conviction was based on an uncharged offense of theft from a foundation and for failure to volunteer information, which is not an offense under state law.

This claim is speculative, conclusory, and without merit.  *See Smallwood v. Johnson*, 73 F. 3d 1343, 1351 (5th Cir.) ("'a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition . . . mere conclusory allegations do not raise a constitutional issue in a habeas proceeding'"), *cert. denied*, 519 U.S. 883 (1996).  The record shows Roberts was properly charged with theft by deception and coercion; the jury was properly charged as to the elements of the offense and instructed that Roberts could be found guilty only if the evidence satisfied those elements; the jury found Roberts guilty as charged; the evidence supports the conviction.  *See Roberts v. State*, 278 S. W. 3d at 791-95.  Because jurors are presumed to follow the trial court's instructions, *see Richardson v. Marsh*, 481 U.S. 200, 206, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), it is presumed Roberts was found guilty as charged and not on some other basis.

The State courts' denial of Roberts's claims is reasonably supported by the record and is consistent with federal law as required by § 2254(d), *see Roberts v. State*, 278 S.W.3d at 788-94, *Ex parte Roberts*, No. 73,992-1 at 424-63, and therefore this Court is compelled to reach the same conclusion.  Roberts's Petition is without legal or factual merit and must be denied.  Furthermore, a habeas corpus petitioner is not entitled to relief or a hearing on his claims when: he failed to allege a basis for relief, he offers "conclusory allegations unsupported by specifics, contentions that in the face of the record are wholly incredible," *Perillo v. Johnson*, 79 F.3d at 444, or allegations that can be resolved on the record without taking additional evidence, *Lawrence v. Lensing*, 42 F. 3d 255, 258-59 (5th Cir. 1994).  Petitioner Roberts is not entitled to habeas relief or a hearing on his Petition because his claims are conclusory, refuted by the record, or are without legal merit.

**III.**

Accordingly, Respondent's motion to dismiss (Entry # 20) is **GRANTED**; Petitioner Roberts's § 2254 Petitions (No. 11-CA-208, Docket Entry # 6, No. 11-CA-276, Entry # 1) are **DENIED**; and these cases are **DISMISSED WITH PREJUDICE**.  All other pending motions are **DENIED** as moot.  Petitioner failed to make "a substantial showing of the denial of a federal right" and cannot make a substantial showing that this Court's procedural rulings are incorrect per Fed. R. App. P. 22 for a certificate of appealability, *see Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct.1595, 146 L. Ed. 2d 542 (2000), and therefore this Court **DENIES** Petitioner a certificate of appealability.  *See* Rule 11(a) of the Rules Governing § 2254 Proceedings.

It is so ORDERED.

SIGNED this 30th day of May, 2013.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

-11-